***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Houser and the briefs and arguments on appeal. The appealing party has not shown good ground to receive further evidence or to amend the holding of the Deputy Commissioner. The Full Commission AFFIRMS the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing as:
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. Plaintiff was an employee of defendant-employer International Mills Service in November 2001.
3. The parties are properly before the Industrial Commission, which has jurisdiction over the parties and over the subject matter.
4. All parties have been correctly designated and that there is no question as to misjoinder or nonjoinder of parties.
5. On the relevant dates herein, AIGCS was the carrier on the risk.
6. At the hearing, the parties submitted a Packet of Medical Records, which was admitted into the record, and marked as Stipulated Exhibit (2), and a Packet of Industrial Commission Forms, which was admitted into the record, and marked as Stipulated Exhibit (3).
7. The issues to be determined are whether plaintiff sustained an injury by accident arising out of and in the course and scope of his employment with defendant-employer, whether plaintiff's injuries were caused by the accident, and if so, to what benefits he is entitled.
 ***********
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was thirty-seven (37) years of age, with his date of birth being 22 September 1965. As of the hearing date, plaintiff resided in Hartsville, South Carolina. Plaintiff is a high school graduate and has an Auto Mechanic Certificate from South Florence Area Vocational School. Plaintiff has his CDL license (Commercial Driver's License) and has taken classes on operating computerized knitting machines and electric work. Plaintiff's work history consists mainly of truck driving and textile work.
2. Plaintiff began his employment with defendant-employer in July 2000 as a mechanic, and later moved to a pit operator position. Plaintiff usually worked second shift from 3:00 p.m. until 11:00 p.m. Defendant-employer provides waste removal services for Ameristeel, which is a steel mill. When steel is produced, it produces a residual liquid byproduct called slag, which is composed of impurities and other waste products from the steel making process. Slag is extremely hot and is continuously siphoned out of the mill into large pits as steel is being produced. Defendant-employer services Ameristeel by digging the slag out of the steel pits and disposing of it.
3. In his position as a pit operator, plaintiff's duties involved digging the slag from pits in a machine called a loader, then driving the loader to a dump truck and transferring the slag into the truck. When a dump truck was filled, plaintiff would drive it to a cooling bay and dump the slag, where it would remain until it was removed from the site.
4. At the hearing, plaintiff testified that on 17 November 2001, he began working his normal shift at approximately 3:00 p.m. When plaintiff initially arrived at work, first shift pit operators Mr. John Meredith and Mr. Billy McAdams were present. When those first shift employees left the work site, plaintiff was the only remaining employee. Later in his shift, plaintiff testified that he drove a dump truck full of hot slag to a slag pit and dumped the load. Then, while using a loader to scrape the slag from the bed of the truck, he noticed flames and smoke shooting up from his left side. It was not uncommon for the loader to catch fire due to the temperature of the slag and it was later discovered that fuel tank had a leak that ignited the fire. Upon noticing the flames, plaintiff exited the caged cab of the loader, and then walked around the walkway in order to access a fire extinguisher which was attached to the outside of the cage. As he sprayed the fire extinguisher into the flames, plaintiff testified that he was overcome with smoke, heat, and extinguisher discharge that caused him to pass out and fall seven to ten (7-10) feet from the loader to the ground.
5. Upon regaining consciousness, plaintiff testified that he felt immediate pain in his head, shoulders, and hands. Additionally, when plaintiff regained consciousness, the fire was still burning so he secured the extinguisher and successfully extinguished the fire. Plaintiff further testified that following this incident, he used his cell phone to call Mr. Meredith, who was a fellow pit operator, and was scheduled to work the next shift. Plaintiff stated that he explained to Mr. Meredith what had transpired, and then made the decision to complete the shift because there were no other employees present.
6. Plaintiff has testified that he reported the incident to his supervisor, Mr. Dale Gosselin on 19 November 2001. Mr. Gosselin testified that on 19 November 2001 plaintiff did report the fire incident, but did not report sustaining any injury. As for not immediately seeking medical attention, plaintiff testified that he initially believed his symptoms would resolve.
7. On 20 November 2001, plaintiff reported to work as scheduled. During his shift, Gosselin asked him to clean a work area. According to Mr. Gosselin, upon being given this instruction, plaintiff became argumentative and Mr. Gosselin then recommended that plaintiff go home for the remainder of the day. Mr. Gosselin testified that this recommendation further angered plaintiff, who then began using profanity while addressing Mr. Gosselin. According to defendants, because of plaintiff's use of inappropriate language and failure to follow Mr. Gosselin's instructions, he was terminated as of 20 November 2001. Defendants further contend that plaintiff did not report a workplace injury until 26 November 2001, after his termination, and that he complained of pain in his chest and ribs and did not report a neck, back or head injury at that time. It is plaintiff's contention that on 20 November 2001, he reported to work and attempted to perform his duties despite experiencing severe pain. Because of his pain, plaintiff states that he spoke with Mr. Gosselin and was informed later that day that he was terminated.
8. Following the incident at issue, plaintiff first sought medical treatment for his symptoms on 30 November 2001. On that date, plaintiff was examined at the Best Care Medical Clinic, and was diagnosed as having sustained a cervical strain, lumbar strain, otalgia, headaches, and numbness in upper and lower extremities, secondary to neck and back trauma.
9. Subsequently, plaintiff underwent a CT scan of the head, as well as an MRI of the brain and cervical spine. On 5 February 2002, plaintiff was examined by Dr. Michael Meighan at Northeast Orthopaedics. Dr. Meighan reviewed the diagnostic tests and noted that plaintiff's MRI indicated a resolving brain contusion, and that a cervical spine MRI revealed a midline disc herniation at C6-C7. Initially following these diagnoses, plaintiff was treated conservatively, but his symptoms continued to worsen.
10. Because of his continuing symptoms, plaintiff sought treatment from Dr. Daniel Murrey, an orthopaedic surgeon, in May 2002. At that time, plaintiff reported experiencing constant severe headaches and problems with dropping things with his hands. Plaintiff also reported experiencing neck pain radiating down his right arm and into his fingers. Dr. Murrey recommended a repeat MRI of the brain and subsequently diagnosed plaintiff as having sustained a traumatic brain injury. In June 2002, Dr. Murrey performed a C5 through C7 anterior cervical discectomy and fusion surgery on plaintiff's back. Approximately six weeks following this procedure, plaintiff continued reporting moderate to severe pain, constant headaches and numbness in his hands. Dr. Murrey has testified that plaintiff has reached maximum medical improvement with respect to his back condition and plaintiff has been assigned a nineteen-percent (19%) permanent partial disability rating for his back. Due to his ongoing headaches, plaintiff was later referred to Dr. Anthony H. Wheeler, a neurologist.
11. Regarding plaintiff's ability to work and earn wages, in January 2002 he found work with a different employer as a mechanic. Plaintiff continued working in that position until 21 May 2002, when Dr. Murrey medically excused him from work until after his surgery. Plaintiff then returned to work on 19 July 2002, but because of his continued post operative difficulties, was only able to work twenty-five to thirty (25-30) hours per week. Plaintiff continued working in this limited hour capacity until 13 September 2002, when Dr. Murrey advised him to stay out of work pending his evaluation with Dr. Wheeler. Plaintiff has not worked in any capacity since that date.
12. On the issue of causation, at his deposition, Dr. Murrey testified that to a reasonable degree medical certainty that plaintiff's back injury and traumatic head injury were caused by the 17 November 2001 work-place incident.
13. Plaintiff was initially examined by Dr. Wheeler on 4 November 2002. At that time, plaintiff reported that he was experiencing radiating neck pain, severe headaches, and pain in both upper extremities. By February 2003, Dr. Wheeler's notes indicate that because of his physical problems, plaintiff was experiencing anxiety and depression, and may be a suicide risk.
14. In this case, defendants have challenged plaintiff's credibility generally, and specifically regarding the extent of his injuries caused by what occurred at work on 17 November 2001. In support of their position, defendants highlight the fact that there are inconsistencies regarding the intensity of the fire and the length of time plaintiff claims to have been unconscious.
15. Although the record does contain inconsistencies on these issues, the undersigned does not find these to be indicative of an overall lack of credibility on plaintiff's part, particularly when the nature of his brain injury is taken into account. Additionally, there is no dispute that a fire did occur at plaintiff's job site on the date in question and the evidence from his medical records corresponds to the type of injury plaintiff reports to have occurred. For the foregoing reasons, the undersigned finds plaintiff's testimony to be credible.
16. The circumstances of plaintiff's injury on 17 November 2001 constituted an interruption of plaintiff's regular work routine and the introduction thereby of unusual conditions likely to result in unexpected consequences.
17. On 17 November 2001, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer.
18. As the direct and natural result of, and causally related to his 17 November 2001 injury by accident, plaintiff sustained a back injury that required surgery, and traumatic head injury.
19. As the result of his 17 November 2001 injury by accident, plaintiff was only able to earn reduced wages during the period of 19 July 2002 through 13 September 2002.
20. As the result of his 17 November 2001 injury by accident, plaintiff was unable to earn any wages in his former position with defendant-employer or in any other employment for the periods of 20 November 2001 through 11 January 2002, from 21 May 2002 through 19 July 2002, and from 13 September 2002 through the present and continuing.
21. Plaintiff's average weekly wage on 17 November 2001 was $516.00, yielding a compensation rate of $344.00.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's average weekly wage on 17 November 2001 was $516.00, yielding a compensation rate of $344.00. N.C. Gen. Stat. § 97-2(5).
2. On 17 November 2001, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6). As the direct and natural result of, and causally related to his 17 November 2001 injury by accident, plaintiff sustained a back injury that required surgery, as well as a traumatic head injury. Id.
3. As the result of his 17 November 2001 injury by accident, plaintiff is entitled to be paid by defendants temporary partial disability compensation at the rate of two-thirds the difference between his average weekly wage at the time of his injury, $516.00, and his average weekly wage during the period of 19 July 2002 through 13 September 2002. N.C. Gen. Stat. § 97-30.
4. As the result of his 17 November 2001 injury by accident, plaintiff is entitled to be paid by defendants ongoing total disability compensation at the rate of $344.00 per week for the periods of 20 November 2001 through 11 January 2002, from 21 May 2002 through 19 July 2002, and from 13 September 2002 through the present and continuing he returns to suitable employment or by further Order of the Industrial Commission. N.C. Gen. Stat. §97-29.
5. As the result of his 17 November 2001 injury by accident, plaintiff is entitled to have defendants pay for all related medical expenses incurred or to be incurred. N.C. Gen. Stat. §§97-25; 97-25.1.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendants shall pay to plaintiff temporary partial disability compensation at the rate of two-thirds the difference between his average weekly wage at the time of his injury of $516.00, and his average weekly wage during the period of 19 July 2002 through 13 September 2002. Having accrued, this compensation shall be paid to plaintiff in a lump sum, subject to the attorney's fee approved herein.
2. Defendants shall pay to plaintiff ongoing total disability compensation at the rate of $344.00 per week for the periods of 20 November 2001 through 11 January 2002, from 21 May 2002 through 19 July 2002, and form 13 September 2002 through the present and continuing he returns to suitable employment or by further Order of the Industrial Commission. From the amounts having accrued, this compensation shall be paid to plaintiff in a lump sum, subject to the attorney's fee approved herein.
3. Defendants shall pay for all related medical expenses incurred or to be incurred as the result of his 17 November 2001 injury by accident.
4. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded herein is approved for counsel for plaintiff. From the compensation having accrued, this fee shall be deducted from the amounts due plaintiff and paid directly to counsel for plaintiff, with counsel for plaintiff receiving every fourth check thereafter.
5. Defendants shall pay costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/____________________ THOMAS JEFFERSON BOLCH COMMISSIONER